James Piotrowski, ISB # 5911
Marty Durand, ISB # 5111
HERZFELD & PIOTROWSKI, LLP
P.O. Box 2864
Boise, ID  83701
Ph:     (208) 331-9200
Fax:    (208) 331-9201
marty@idunionlaw.com
jpiotrowski@hpllp.net


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RUSSELL KNAPP, et al., | ) | |
| | ) | Case No. 1:11-cv-307 |
| Plaintiffs, | ) | |
| | ) | PLAINTIFFS' REPLY TO RESPONSE TO |
| v. | ) | MOTION FOR TEMPORARY |
| | ) | RESTRAINING ORDER AND |
| RICHARD ARMSTRONG, et al., | ) | PRELIMINARY INJUNCTION |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiffs seek preliminary relief prohibiting the Director and Administrator of Idaho's

Medicaid system from implementing a selective contract which would force every Certified

Family Home in the State of Idaho to terminate their relationship with the residential habilitation

agency which currently provides supervision, oversight, and other services, and instead rely

solely on a  single contractor, selected by Defendants, to provide this critical service.  In its

opening brief the Plaintiffs described the services they receive from residential habilitation

agencies, the important role those services play in assuring appropriate, high quality, dynamic

care for Medicaid participants with severe developmental disabilities, and explained that in the

absence of express federal approval for this selective contracting plan, it was prohibited as a

matter of law.  In response, the State defendants have admitted that they need federal approval,

Plaintiffs' Reply in Support of Preliminary Injunction - 1

though they dispute the precise type of approval they need, and claim that it can be granted by the responsible federal agency retroactively.  Defendants are wrong on nearly all counts.

Well-established law in the Ninth Circuit expressly prohibits relying on future, retroactive approval of changes to Medicaid.  Because that federal approval is needed, and retroactive approval is both inadequate and unavailable, Plaintiffs are certain to prevail on the merits of their claim that the state plan scheduled to be implemented August 5, 2011 is entirely preempted by federal law.  Because the loss of critical services will result in harm that cannot be remedied after the fact, Plaintiffs have demonstrated irreparable harm.  The public interest, and the balance of equities tip in Plaintiffs' favor.  As a result, the implementation of the selective contract for residential habilitation services should be enjoined pending further proceedings in this case and a the Department of Health and Human Services.

**I.  Because the State Admits that an Amendment to Its Waiver and/or State Plan is Necessary in Order to Implement the Selective Contract with Community Partnerships, Plaintiffs are Almost Certain to Succeed on the Merits of their Claim.**

    **A.  The State's Selective Contract Proposal Requires, at the Very Least, CMS Approval of a Waiver Amendment Before Implementation, Which Approval Has not Been Obtained.**

The State's response to the motion for preliminary injunction raises numerous grounds having to do with the nature of the activities that constitute residential habilitation affiliation, the State's ability to treat these activities as something other than "services" subject to the free choice provisions of federal law, and the nature of the claims raised and whether they are justiciable.  Most important for the Court's consideration at this moment is the simple admission by the State that the implementation of the selective contract with Community Partnerships of Idaho ("CPI") will require an amendment to the State's DD waiver.  Because the state has not

received approval of such an amendment, the implementation of that amendment is absolutely barred as a matter of well-established law in the Ninth Circuit.

As discussed in more detail in the Plaintiffs' Reply to Response to Motion for Order to Show Cause in the case *Affiliates, Inc. v. Armstrong,* Case No. 1:09-cv-149, changes in a state's policies or practice which effect the provisions of a waiver must be approved by the federal Center for Medicare and Medicaid Services ("CMS") <u>before</u> they are implemented. *Exeter Memorial Hosp. Ass'n v. Belshe*, 145 F.3d 1106 (9th Cir. 1998), relying on *Wash. State Health Facilities Ass'n v. Washington Dep't of Soc. & Health Servs.*, 698 F.2d 964 (9th Cir. 1982) and *Or. Ass'n of Homes for the Aging, Inc. v. State of Oregon,* 5 F.3d 1239 (9th Cir. 1993); *Cal. Hosp. Assn. v. Obledo,* 602 F.2d 1357, 1361 (9th Cir. 1979); *Affiliates, Inc. v. Armstrong,* Case No.  1:09-cv-149, Memorandum Opinion and Order Granting Temporary Restraining Order (April 30, 2009*); Cal. Hosp. Assn. v. Maxwell-Jolly*, 2011 U.S. Dist. LEXIS 21794 (E.D. Cal. Mar. 4, 2011);  *Cal. Assn. of Rural Health Clinics v. Maxwell-Jolly*, 2010 U.S.Dist. LEXIS 111788 (E.D. Cal. Oct. 20, 2010).

The arguments supporting this conclusion of law, which the Court is bound to follow, will not be repeated here.  Plaintiffs herein incorporate the reply brief of Plaintiffs in *Affiliates, Inc.* as if fully restated.

## B.  Even if Retroactive Approval Were Legally Adequate, It is Not Available Under CMS' Own Rules.

Even assuming that somehow the Court concludes that retroactive approval is legally adequate, the amendment that the Defendants propose to submit to CMS is not eligible, even under CMS' rules, for retroactive approval, and thus cannot be implemented until approved.

CMS' technical guidance explains that retroactive approval of a waiver amendment may be granted "unless the amendment would result in a reduction of the number of persons served,

services provided, or providers." CMS Manual, Grooms, Ex. B, pp. 30-31. The Defendants'

argument throughout their brief is that they intend to eliminate residential habilitation affiliation

as a service, and that CPI will perform an "administrative function" that amounts to no more than

"quality assurance." If the Court believes that this relabeling is legally significant (e.g., it turns

affiliation into something other than a service under Section 30(A)), then it must also conclude

that the amendment "would result in a reduction of . . . services provided." In such case,

according to CMS' own procedures, retroactive approval is not available.

### C. The State's Attempted Implementation in Advance of Receiving Approval Has the Effect of Barring Either Administrative or Judicial Review.

While the State complains that the Court should not "pretermit" CMS' ability to make

retroactive approval, the reality of the situation is that if the state implements on August 5, it is

the State that forces CMS to grant retroactive approval, since the implementation cannot be

undone. As discussed further below, the State's approach to this situation guarantees that

whatever harm occurs is entirely irreparable. Only by entry of a preliminary injunction can the

Court actually ensure that the State's conduct is subject to meaningful administrative and judicial

review.

The State of Idaho admits that it has not even applied for, much less received approval of

the waiver amendment that it intends to seek regarding the services at issue in this litigation.

Paige Grooms, via affidavit, testifies that she is "supervising the preparation and submission of a

[waiver] amendment to CMS." Grooms, para. 3. A waiver amendment is necessary here, since

the Department is proposing to eliminate affiliation as a service, and simultaneously create a new

quality control administrative function. Paige Grooms explains that the "waiver amendment

application will be submitted July 22, 2011." Grooms, para. 15. In addition, she states that

IDAPA rules will be changed effective August 3, 2011, the day the proposed changes are

Plaintiffs' Reply in Support of Preliminary Injunction - 4

published.  The CPI contract goes into effect August 5, 2011.  This truncated timeline is purely a creature of the Defendants' own decisions about how to proceed.  Nothing would prevent Director Armstrong or Administrator Clement from seeking approval of the waiver amendment prior to implementation of the contract.  And, as set out above, that is precisely the requirement imposed by the law.

The Defendants have consciously chosen to ignore the law despite the fact that they have been expressly informed of it in the *Affiliates, Inc.* case, via the Court's ruling on the original temporary restraining order.  Because CMS approval is a prerequisite to implementation of the change, and Defendants admit that approval has not been received, Plaintiffs are not only likely, but certain to prevail on the merits of their claim that the selective contract violates federal law, at least until such time as CMS approval is received.

## II.  Plaintiffs are Also Highly Likely to Succeed on the Merits of their Claim that the State Must Receive a New Waiver under 42 USC §1396n(b)(4) Before they May Proceed With Selective Contracting.

As discussed above, the Court should enjoin implementation of the selective contract because no amendment of the existing DD waiver under 42 USC 1396n(c) has been approved by CMS.  Beyond that, however, the Plaintiffs are also likely to succeed on the merits of their claim that the State may not implement the selective contract unless they receive a waiver under 42 USC §1396n(b)(4) which deals expressly with waivers of the freedom of choice requirements of federal law.

The free choice provision of the Medicaid Act guarantees to participants such as the Plaintiffs Knapp and Schultz, the right to seek services from any qualified provider.  It provides that any individual eligible for medical assistance or services under Medicaid "may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform

the service or services required."  42 USC §1396a(a)(23).  The State attempts to avoid the clear

implication of this statutory requirement by defining what residential habilitation agencies do as

something other than "assistance" or "services."  First, they attempt to merely apply the label

"affiliation" and claim that "affiliation" is not a service provided to Medicaid participants.  Then

they attempt to further define "affiliation" as consisting of "Medicaid Operational or

Administrative Functions."  The label applied by the state is not determinative.  The statute

requires free choice whenever the particular function constitutes "assistance" or "service."

The question then is whether the activities conducted by residential habilitation agencies

in the CFH setting constitute "assistance" or "services" to Medicaid participants, such that they

fall with §1396n(a)(23) and are subject to freedom of choice.  The State's attempts at relabeling

and redefinition fail because federal law defines these activities as Medicaid services, the State

has long admitted that these activities are a direct service, in actual fact these activities constitute

direct service and assistance, and as a matter of law these activities do not constitute

"Operational or Administrative Functions" which CMS allows to be exempt from freedom of

choice.

### A.  The Activities Performed By Residential Habilitation Agencies Are Defined by Law as Medicaid Covered Assistance and Services.

Residential habilitation is solely a "waiver service" meaning that it is a service that is

made available under Medicaid solely as the result of the State's receipt of a waiver under 42

USC 1396n(c).  Because this is a statutory service, it is defined in the statute, and repeatedly

addressed in the technical guidance issued by the Department of Health and Human Services.

Furthermore, the existing DD Waiver defines the scope of the service.  All of these sources

define residential habilitation as a direct service, and within those definitions include the

particular tasks that are currently performed by residential habilitation agencies in the

"affiliation" setting.  In other words, as a matter of law the activities that are being called "affiliation" are direct services as to which Plaintiffs Knapp and Schultz are guaranteed freedom of choice of provider.

The existing DD Waiver is approved under 42 USC 1396n(c), which permits the Secretary of Health and Human Services to issue a waiver allowing a state to "include as 'medical assistance' under such [state Medicaid] plan payment for part or all of the cost of home or community-based services."  42 USC 1396n(c)(1).  When a waiver is granted, a state is permitted to provide "case management services, homemaker/home health aide services and personal care services, adult day health services, habilitation services, respite care" and other services.  42 USC 1396n(c)(4)(B).  Under the same statute,

For purposes of paragraph (4)(B), the term "habilitation services" –

(A) means services designed to assist individuals in acquiring, retaining, and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community based settings;

42 USC 1396n(c)(5).  The services actually provided by residential habilitation agencies in the State of Idaho in the CFH setting meet these definitions as they consist of  services specifically designed to assist the individual participant (e.g., program implementation plan drafting and modification) to acquire, retain and improve that recipient's independent living skills.  The services are highly individualized, consist of planning, programming and training for the needs of the individual participant, and relate directly to residing successfully in the community.

The Medicaid Act also defines "assistance" in a functional manner by specifying which activities are included in "assistance." 42 USC §1396d(a).  This functional definition, tied to federal financial participation, is the appropriate starting point precisely because the very purpose

of the Medicaid Act is to provide the conditions under which the federal government will reimburse the state for medical assistance provided to the poor.

Pursuant to the Medicaid Act, "assistance" includes, among many other things, "home health care," 42 USC §1396d(a)(7), "rehabilitative services" and "remedial services," 42 USC §1396d(a)(13), "case management services," 42 USC §1396d(a)(19), "home and community care," 42 USC §1396d(a)(22), "community supported living arrangements services," 42 USC §1396d(a)(23), "personal care services," 42 USC §1396d(a)(24), and "any other type of remedial care recognized under state law." 42 USC §1396d(a)(29).

In its technical guidance manual addressing HCBS waivers, the Department of Health and Human Services, through its Center for Medicare and Medicaid Services ("CMS") has also provided extensive discussion of the nature of the services that will be deemed to constitute covered Medicaid services. CMS's technical guidance explains that waiver services may consist of both "statutory services" and "other services." Supp. Piotrowski Dec., Ex. 1, CMS Manual, p. 111. "Habilitation" generally is defined therein as "Services designed to assist participants in acquiring, retaining and improving the self-help, socialization and adaptive skills necessary to reside successfully in home and community-based setting." CMS Manual, p. 151. "Residential Habilitation" is defined more explicitly:

> Residential habilitation means individually tailored supports that assist with the acquisition, retention, or improvement in skills related to living in the community. These supports include adaptive skill development, assistance with activities of daily living, community inclusion, transportation, adult educational supports, social and leisure skill development, that assist the participant to reside in the most integrated setting appropriate to his/her needs. **Residential habilitation also includes personal care and protective oversight and supervision.**

CMS Manual, pp. 151-152(emphasis added).  While the service definitions actually utilized by a state do not have to duplicate CMS definitions, CMS provides guidance in what constitutes a "service."  An activity constitutes a permissible waiver "service" if it:

* Contributes to the community functioning of waiver participants and thereby avoids institutionalization;
* Is reasonably related to addressing waiver participant needs that arise as a result of their functional limitations and/or conditions; and/or
* Falls within the scope of §1915(c) [42 USC §1396n(c)] and is not at odds with other provisions of the Act.

CMS Manual, p. 127.  The activities of residential habilitation agencies in the CFH setting meet all of these criteria and thus constitute "services" within the meaning of the Medicaid Act.

Based on the statutory provisions and the technical guidance it is no surprise that the DD Waiver itself specifies that among the <u>services</u> provided as part of residential habilitation is "Skills Training to teach waiver participants, family members, alternative family caregiver(s), or an individual's roommate or neighbor to perform activities with greater independence and to carry out or reinforce habilitation training."  Supp. Piotrowski Dec., Ex. 2, Waiver, App. C.  The Waiver, in defining the statutory service of Residential Habilitation also requires that CFH providers receive "training specific to the needs of the participant" and specifies that as part of this element of the statutory service, a Residential Habilitation Agency "is responsible for providing on-going training specific to the needs of the participant as needed."  Waiver, App. C. These are not mere administrative or quality assurance functions, but constitute direct service in ensuring that CFH providers have personalized their provision of service to the particular participants in their homes.

While the state attempts to define the activities performed by residential habilitation agencies in CFHs as mere "affiliation," the extant law, both federal and state, defines those services as direct service, covered by the Medicaid act.  Because these are approved Medicaid

Plaintiffs' Reply in Support of Preliminary Injunction - 9

"services," and because they constitute "assistance" they are subject to the free choice provisions of 42 USC 1396a(a)(23).  Merely redefining those services does not render them exempt from this provision.

**B.   The Actual Services Provided and Received Under the Waiver Constitute Assistance and Services Under the Free Choice Provisions of §1396a(a)(23).**

Consideration of the actual services provided by residential habilitation agencies in CFHs reveals the reality of direct service.  Furthermore, the State of Idaho has for a period of years insisted that even in the "affiliation" relationship, residential habilitation agencies are direct service providers.  Given these prior admissions, it is highly likely that Plaintiffs will succeed on the merits of their claim that they are entitled to free choice in providers.

In the course of performing the multitude of activities that are included in the residential habilitation affiliation services, provider agencies directly serve the needs of Medicaid participants.  On a regular basis, such agencies engage in face to face meetings to assess the appropriateness of the services being received, and, perhaps most importantly, such agencies actually write the detailed service plans that specify exactly how services will be provided. Dunagan Declaration, para. 6.  Such service plans are not merely of a generalized "quality control" nature, but rather list the specific modes and methods by which the CFH provider will interact with the client.  Such plans will specify what tasks the client must complete, the particular incentives or disincentives that CFH provider may or may not use, and the precise methods of measuring whether the client is attaining new independent living skills or maintaining existing skills.  Howell Dec., Ex. 1.  The implementation plans are exceedingly personalized, specifying, for instance, the individuals who will assist with particular tasks, those who are available to the client in case of an emergency, when certain tasks will be performed, the clothes the client will be encouraged (or discouraged) to wear, even the particular physical

prompts or cues that will be used to signal a particular behavior.  Id.  The implementation plans are not the end of the process, however, when it comes to particularizing residential habilitation services.  As a client's social, behavioral or health needs change, the methods and modes of serving the client also change.  Residential habilitation agencies ensure that changes in treatment are made on an ongoing basis in order to best serve the client's needs.  Scott Dec., para. 11.

These services are valued both by CFH providers and the clients they serve.  The skills training provided both to Medicaid participants and their family members and providers enhance the ability to live independently. Knapp Dec., para. 8.  That training is critical to quality of life for severely disabled residents of CFHs.  Knapp Dec., para. 9.  Program coordinators individualize the training of clients, family members and providers to meet the particular needs of the particular client, and provide additional personalized programming of services.  Schultz Dec., para. 10.  Far from being mere quality control, the role of the residential habilitation program coordinator is to tailor services to the particular client in ways that neither the developmentally disabled nor untrained CFH providers would be able to do on their own.

The current DD waiver was first approved in 1995.  The "affiliation" service has been in place since then, and has, for some 16 years now, been treated by the State of Idaho, the federal government, and the Plaintiffs as a direct service to Medicaid participants.  During those same 16 years, the State of Idaho has expressly chosen not to treat "affiliation" as an administrative function.  The consequences are and have been significant and favorable for the State of Idaho. The federal government pays different matching amounts depending on whether a service is identified as direct care or administrative.  Direct care services, including residential habilitation affiliation until now, are reimbursed at a rate that is determined on the basis of the State's relationship to national per capita income.  For a relatively poor state like Idaho, the federal share

of funding for services will be fall between 55% and 83% of the reimbursed cost of such

services. 42 CFR 433.10.  Administrative functions are generally only reimbursed at a rate of

50% of cost, unless they fall into one of several special categories (e.g., Medicaid fraud units

such as that at the Idaho Attorney General's office, are reimbursed at 90%).  42 CFR 433.15(7).

For more than a decade, the State of Idaho has defined residential habilitation affiliation as a

direct service in order to secure the more generous federal financial participation provided for

direct  services.  It is only now, as a post-hoc rationalization of its attempt to cut reimbursement

rates that it seeks to redefine those services as administrative functions.

    Furthermore, a change of the nature that the State is seeking to implement on August 5,

2011, would also require a change in the State's "cost allocation plan."  42 CFR 433.34.  Such

plans must set out how the State accounts for the various functions performed by it and its

contractors that contribute to the performance of the overall Medicaid plan.  Switching affiliation

from a service to an administrative function is precisely the type of change that requires an

amendment to the cost allocation plan.  45 CFR §95.509.  Such allocation plans are not routinely

approved on a retroactive basis, but rather once approved may only be implemented on the first

day of the following calendar quarter.  45 CFR §95.515.  While the current cost allocation plan is

not in evidence, that is a matter easily remedies by the Defendants if they have in fact requested

an amendment and it has been approved.  Since the Court should presume the State operates its

Medicaid program lawfully, it should also presume that since 1995, the State's cost allocation

plan has treated affiliation as a service and not as an administrative function.

    The Department, to its credit, has been consistent in treating affiliation as a direct service.

In 2006, residential habilitation agency Provider Affiliates Agency, Inc. underwent a regular

review for quality assurance.  In the course of that review the Department staff engaged in an

"exit meeting" in which the results of the review are discussed with the Agency.  The Administrator for Provider Affiliates Agency, Cindy Dunagan, participated in the exit meeting on behalf of the company.  The Department noted that there were certain training requirements that had not been met for some of the Agency's staff.  Specifically, the Department noted that one staff member was missing her First Aid certification, and that three other staff members were missing evidence of having completed or maintained training in cardio-pulmonary resuscitation (CPR).  Supp. Dec. of Dunagan, Ex. 1.  Administrator Dunagan objected to these findings on the basis that the four staff members in question did not provide "direct care" and thus should not be required to obtain first aid and CPR certification.  In a follow up phone call, the Department, through its Deputy Administrator Randy May, disagreed with Dunagan, insisting that both program coordinators and the Agency Administrator must maintain current certification because they are all "direct care staff."  Supp. Dec. of Dunagan, para. 8.

Both the nature of the actual services provided, and the State of Idaho's previous admissions (those made officially to secure federal funding, and those made to individuals such as Ms. Dunagan) demonstrate that residential habilitation affiliation constitutes a direct service and assistance to Medicaid participants as to which participates must be guaranteed freedom of choice in the absence of a waiver.

### C.  The Services that Will be Provided by CPI Will Also Constitute Covered Services to Participants.

The contract between the State and Community Partnerships of Idaho clearly spells out services that are within the definition of habilitation provided directly to and/or for the benefit of Medicaid participants.   Under the very terms of the State's Contract, Medicaid participants will be denied the right to choose their provider of covered services and assistance.

The State's contract with CPI sets out in some detail the "Contractor Responsibilities" that CPI has agreed to undertake.  These include, among others an agreement to:

* Develop Initial Program Implementation Plans ("PIPs"), and subsequent, annual PIPs;
* acquire data from participants, guardians, family, individuals necessary for the completion of PIPs;
* Conduct face to face interviews with both CFH providers and participants;
* "Ensure that each PIP addresses functional barriers to independent living";
* Complete "initial residential habilitation program coordination plan including PIPs and written instructions as necessary for CFH providers to provide habilitation";
* Provide skill training;
* Assist CFH providers with implementing or modifying the established PIPs;
* Assist CFH providers with "required provider status reviews";
* Modify each PIP as necessary;
* Document and report participant health and safety concerns;
*report concerns about CFH providers not following through with the implementation of the habilitation plan.

The creation, modification, amendment, and monitoring of care treatment plans is a Medicaid service in nearly every setting where Medicaid covered services are provided.  The creation and monitoring of treatment plans is itself a specific waiver service provided to participants.  42 USC 1396n(c)(24)(A) (providing for case management services).  More importantly, such plans detail the precise means and methods by which a particular participant will actually receive residential habilitation services.  PIPs are modified only in response to a change in a particular participant's health, behavior or social condition, and such modifications are thus part of providing appropriate care.  The activities specified in the State/CPI contract constitute "assistance" and "services" within the meaning of the free choice provisions of 42 USC 1396a(a)(23).

### D. The Activities at Issue are Well Outside the Scope of "Operational and Administrative Functions" Which the State is Permitted to Selectively Contract.

The State of Idaho also claims that is expressly permitted to selectively contract, despite the free choice provisions of federal law, because the activities in question constitute

"Operational and Administrative Functions."  Nothing in the Medicaid Act defines these terms, but CMS defines them both functionally, within the Waiver Application form it distributes, as well as in its technical assistance manual.  Pursuant to both sources, the "Operational and Administrative Functions" which may be contracted out are far more limited in scope than the activities currently carried out by residential habilitation agencies or which will be carried out by CPI under the State's contract.

In the Waiver Application form distributed by CMS to states such as Idaho which wish to utilize such a waiver, CMS lists the functions which are deemed "Operational and Administrative" and which may be performed by either the State Medicaid agency or a contractor.  Waiver, Appendix A, Sec. 7.  The State of Idaho claims only that the functions which are being selectively contracted constitute "Quality assurance and quality improvement activities."  CMS' technical manual defines quality assurance and quality improvement as "activities related to discovery and remediation activities conducted for the waiver, as well as the mechanisms for overall systems improvement."  Manual, p. 67.  The provision of direct services, such as the drafting of detailed, highly individualized implementation plans is specifically treated by CMS as separate and distinct from quality assurance functions.  Compare CMS Manual p. 174-175 and 178 (Defining and describing the person-centered planning process and the implementation of such plans) to Manual, pp. 185-188 (Describing and defining service plan monitoring and quality assurance as separate functions).

The activities that are currently performed by residential habilitation agencies and which will, in the absence of injunctive relief, be performed by CPI, go well beyond quality assurance. As noted above, the drafting and modification of program implementation plans that are highly individualized to the needs of a particular participant is an essential part of the service, and a

specific task under CPIs contract.  Likewise, the training of CFH caregivers, as well as family members and other natural supports of the participant, is a direct service that falls within the definitions of residential habilitation, not quality assurance.  While some of the activities of residential habilitation agencies meet the definition of quality assurance, the full scope of activities as to which the State intends to restrict free choice do not meet that definition.

### E. The Selective Contract with CPI Requires a New Waiver, Not Merely Amendment of the Existing Waiver.

The existing DD waiver was applied for and granted as a waiver under 42 USC §1396n(c).  Such waivers address the provision of home and community based services as an alternative to institutionalization.  Such waivers are limited in that they allow CMS to waive only the "statewideness," "comparability" and eligibility requirements of the Medicaid Act.  42 USC §1396(c)(3).  Because the proposed selective contract with CPI would prevent free choice of providers, the State must receive a waiver of the free choice requirement in 42 USC §1396a(a)(23).  That requirement may only be waived if the state applies for and receives a waiver under §1396n(b), which it has not done.  The present waiver, even if amended is a subsection (c) waiver, not a subsection (b) waiver.  The requirements and procedures for the two types of waiver vary.  There is absolutely no provision in statute, regulation or CMS' technical guidance that would allow a new waiver to be granted with a retroactive effective date.

### III.  Neither Sovereign Immunity Nor Primary Jurisdiction Interpose Any Bar to Entry of a Preliminary Injunction or Resolution of the Merits of this Case.

#### A. CMS, Whether Under Established Decisional Law in the Ninth Circuit, or Under Its Own Interpretation of its Authority, Does not Have the Power to Retroactively Approve a Waiver Amendment in the Present Circumstances.

The State admits that its position regarding the availability of retroactive approval of waiver amendments "contrasts with Ninth Circuit precedent," Memorandum in Opposition, p. 7.

Plaintiffs' Reply in Support of Preliminary Injunction - 16

Nonetheless, they attempt to rely on CMS's technical guidance which states that, notwithstanding federal law, waiver amendments may be approved retroactively "unless the amendment would result in a reduction in the number of persons served, services provided or providers." Memorandum, p. 8, quoting CMS Manual at 30-31. But the State admits that its present plan is to eliminate affiliation as a service, and to add a quality control function. This is necessarily a "reduction in . . . services provided." CMS Manual at 30-31. Thus, under both Ninth Circuit precedent, and CMS's technical guidance, retroactive approval is simply not available. The issues raised about sovereign immunity and/or primary jurisdiction are simply irrelevant where retroactive approval is legally impermissible.

### B. Because Plaintiffs Are Not Relying on a Contract Theory of Liability, Sovereign Immunity is No Bar to Resolving this Case.

The State's argument on sovereign immunity follows a three-step progression. First, the State argues, an attempt to enforce a waiver is a claim sounding in contract, specifically, third-party beneficiary. Second, in a suit enforcing a contract between the State and CMS, CMS must be made a party. Third, CMS cannot be made a party because of sovereign immunity. Memorandum in Opposition, pp. 9-11. This analytical theory fails in its very first step because Plaintiffs are not relying on any contract-based theory of law, not even third-party beneficiary. Plaintiffs bring this motion for injunction purely on the basis of federal preemption of state conduct, as to which claim, sovereign immunity is not a bar.

For purposes of this injunction, Plaintiffs are relying on both a direct cause of action and a cause of action under 42 USC §1983 to enforce the provisions of federal statutes. While a contract theory exists and might be available to Plaintiffs for violation of the terms of a Medicaid waiver, the Court should evaluate (and grant) the request for injunction purely on preemption principles. A direct cause of action under the Supremacy Clause exists where Plaintiffs seek

Plaintiffs' Reply in Support of Preliminary Injunction - 17

injunctive relief on the basis of preemption.  *Independent Liv. Ctr. v. Shewry,* 543 F.3d 1050 (9th Cir. 2008).  "[I]njunctive relief is presumptively available in federal court to enjoin state officers from implementing a law allegedly preempted under the *See* Supremacy Clause." *Id.*, at 1057. Such relief is certainly available where a state seeks to modify its Medicaid program in a way that would conflict with the requirements of 42 USC §1396a.  *Id.*  This is precisely the first basis of Plaintiffs' claims, that the selective contract is preempted by the free choice provisions of §1396a.  Plaintiffs need not, and do not, rely on a contract theory in seeking this injunction.

It is true that the District Court in *Cal. Hosp. Assn. v. Maxwell-Jolly,* 2011 U.S. Dist. LEXIS 21794 (E.D. Cal. Mar. 4, 2011) considered a contract theory and did so at the precise pinpoint citation provided bin the State's Memorandum in Opposition.  Memorandum in Opposition, p. 9, citing *Cal. Hosp. Ass'n* at *18.  But the discussion of contract in that case was not, as the State contends to establish a contractual basis for liability under the Medicaid Act, rather it was a discussion of a particular claim for relief brought by the Plaintiffs therein for violation of the Contracts Clause of the U.S. Constitution.  In its lengthy discussion of the preemption based claims brought by the plaintiffs, the Eastern District of California did not rely on any contract-based theory.  Rather, that Court held that a "state Medicaid agency may not *implement* the amendments until federal approval is actually obtained" and did so on the basis of causes of action arising under the Supremacy Clause and 42 USC §1983, without any reference to a contract theory of rights.   *Cal. Hosp. Assn.*, 2011 U.S. Dist. LEXIS 21794, *47,   Further, that Court held that the state of California's attempted reliance on sovereign immunity was "incorrect," *Id.,* at *57, because claims for prospective injunctive relief do not implicate sovereign immunity under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441 (1908).

The legal requirements of free choice, timely amendment, and full compliance with federal law all arise from the Constitution, federal statutes, and federal regulatory materials (the CMS technical guidance).  None of those requirements rely upon, and for purposes of this injunction request none of those claims need any basis in the law of contracts.  The state's third-party beneficiary theory is imply inapplicable and, as a result, its claim that Plaintiffs must join CMS to this action in derogation of sovereign immunity is incorrect.[1]

### C. The Court Should Not, as a Prudential Matter, Invoke Primary Jurisdiction to Bar Consideration of This Case.

The State next claims that the judicial doctrine of primary jurisdiction should be invoked to bar consideration of this case.  Primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *County of Santa Clara v. Astra USA, Inc.,* 588 F.3d 1237, 1251 (9th Cir. 2009) quoting *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc*., 307 F.3d 775, 780 (9th Cir. 2002).  As a "prudential" doctrine which permits, but does not require a court to stay its hand, it is a matter of the Court's discretion exercised under appropriate standards.

In *County of Santa Clara*, despite the existence of a comprehensive administrative enforcement scheme available to the plaintiffs therein to seek an administrative agency's enforcement of the underlying statute, the Ninth Circuit held that primary jurisdiction was not properly invoked or applied to bar a third party beneficiary contract claim.  *Id.*  "[P]rimary jurisdiction is properly invoked when a claim is cognizable in federal court but requires

---

[1] The recent decision in *Astra USA, Inc. v. Santa Clara County,* 131 S.Ct. 1342 (2011) provides no meaningful guidance for the Court on these issues.  *Astra* involved a claim brought by public entity health providers for breach of contract, alleging as the "contract" a participation agreement signed by drug manufacturers under the provisions of Public Health Services Act, 42 USC §256b.  Because the plaintiff in that case had no statutory right of action, it attempted to rely on a third-party beneficiary theory.  Plaintiffs in this case have both a recognized statutory cause of action, 42 USC §1983, and a cause of action directly under the Supremacy Clause, and have not alleged or attempted a third-party beneficiary contract claim.

Plaintiffs' Reply in Support of Preliminary Injunction - 19

resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.* (quoting *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002))

There is no issue of first impression in this case, despite the State's bald assertion that one exists as to retroactivity. The Ninth Circuit and the District Courts within it have repeatedly addressed the claim made by the State here that it may seek and rely upon retroactive approval of a Medicaid amendment. *Exeter Memorial Hosp. Ass'n v. Belshe*, 145 F.3d 1106 (9th Cir. 1998); *Or. Ass'n of Homes for the Aging, Inc. v. State of Oregon,* 5 F.3d 1239 (9th Cir. 1993); *Wash. State Health Facilities Ass'n v. Washington Dep't of Soc. & Health Servs.*, 698 F.2d 964 (9th Cir. 1982); *Cal. Hosp. Assn. v. Obledo,* 602 F.2d 1357, 1361 (9th Cir. 1979); *Cal. Hosp. Assn. v. Maxwell-Jolly*, 2011 U.S. Dist. LEXIS 21794 (E.D. Cal. Mar. 4, 2011); *Cal. Assn. of Rural Health Clinics v. Maxwell-Jolly*, 2010 U.S.Dist. LEXIS 111788 (E.D. Cal. Oct. 20, 2010). Indeed, this is not even an issue of first impression in the District of Idaho. *Affiliates, Inc. v. Armstrong,* Case No. 1:09-cv-149, Memorandum Opinion and Order Granting Temporary Restraining Order (April 30, 2009).

Nor is the issue particularly complicated, as demonstrated by the same decisions cited above. Federal statute requires federal approval as a prerequisite to the use of federal funds to operate a Medicaid program. 42 USC §1396-1; 42 USC §1396b. It requires federal approval as a prerequisite to waiver of the statutory requirements for such a program. 42 USC §1396n. The sole factual issue presented is whether such approval has been granted. The sole legal issue is whether the statute permits the state to implement in advance of approval, and that legal issue has been decided by the Ninth Circuit.

There is no basis on which to rest a claim of primary jurisdiction to stay action in this case.

**IV.  Plaintiffs Have Demonstrated That They Will Suffer Irreparable Harm.**

If the State proceeds with its current plan to force every resident of a CFH to accept residential habilitation services from CPI as of August 5, 2011, each of those residents will be required to terminate a current therapeutic relationship, and start a new one.  The Plaintiffs believe, and have testified without contradiction from the Defendants, that those current relationships enhance quality of life, and that CPI will be unable to promise or provide the same level of enhancement.  This is sufficient to constitute irreparable harm.

Plaintiffs herein admit that they are unable to quantify the harm that will be suffered, and further admit that for many CFH residents, the harm will be relatively minor.  But the test for an injunction is not simply whether the harm to be incurred is small or great, but rather focuses primarily on whether it is irreparable, and whether it is likely to occur in the absence of injunctive relief.

The freedom to choose one's own provider of health services is itself a public good, and, pursuant to Congressional decree, a valuable right of Medicaid participants.  *Ball v. Rodgers,* 492 F.3d 1094 (9th Cir. 2007).  The consideration of success on the merits is not wholly divorced from the Court's consideration of irreparable harm, as the State suggests.  *Earth Island Inst. v. Carlton,* 626 F.3d 462, 474-475 (9th Cir. 2010) makes entirely clear "that there is significant overlap between these two issues."  This is part of the reason the "sliding scale" approach to preliminary injunctions was not eliminated by *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 129 S.Ct. 365 (2008).  *Alliance for the Wild Rockies v. Cottrell*, 622 F.3d 1045, 1052-53 (9th Cir. 2010).  The denial of a right extended as a matter of federal statute constitutes injury or

harm to the extent that it involves "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130 (1992). There can be no dispute that the Medicaid Act creates a legally protected interest in choosing one's own health providers, and that the invasion of that interest will occur imminently, i.e., on August 5, 2011. -- an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent.

As discussed in Plaintiffs' opening brief, the harm will be irreparable because no cause of action for post-injury, retrospective relief exists. Defendants have not disputed that aspect of Plaintiffs' position.

There can be no dispute that Plaintiffs will suffer an injury that is irreparable. Given the extremely high probability of success on the merits, Plaintiffs should not have to suffer even a modest degree of irreparable injury, and an injunction should issue.

## V. Idaho's Need for Federal Funding Is Not a Public Interest That Outweighs Compliance with Federal Conditions Placed Upon Receipt of That Funding.

The State's sole argument regarding the public interest amounts to no more than that it relies on federal funding. While this is doubtless true, that funding comes with express conditions set out in federal law. The U.S. Congress has declared it a matter of national public policy that Medicaid recipients be free to choose their health care providers. Likewise, the public policy of federal supremacy is enshrined in the Constitution. *See Cal. Pharmacists Ass'n*, 563 F.3d at 853 (considering the public interest represented by the Constitution's declaration that federal law is to be supreme). "[T]he public has an overriding interest that State government comply with State and Federal law." *Washington State Pharmacy Association v. Gregoire,* USDC, Case No. 09-5174-BHS, Order Granting Motion for Temporary Restraining Order (W.D. Wa., March 31, 2009). There is no "public" interest in allowing the State of Idaho to skirt

Plaintiffs' Reply in Support of Preliminary Injunction - 22

federal requirements to the detriment of developmentally disabled people living in poverty.  To suggest otherwise strains credulity.

## VI.  Conclusion

All of the elements required for a preliminary injunction have been shown.  The State's proposed action, scheduled to occur on August 5, 2011, violates well-established law.  As to that claim, Plaintiffs are almost certain to succeed on the merits of their claims.  In the absence of injunctive relief, Plaintiffs and the class will suffer a deprivation of rights guaranteed by statute, will lose the effective treatment relationships they have formed with residential habilitation agencies, and are likely to see less effective care and treatment as a result.  The public interest, as expressed by Congress, the body Constitutionally charged with establishing public policy, weighs in favor of injunctive relief.  For all these reasons, the Court should preliminarily enjoin implementation of the contract between the State and CPI pending resolution of this case on the merits.

Respectfully submitted this 22nd day of July, 2011.

HERZFELD & PIOTROWSKI, LLP


_____/s/_____
James Piotrowski
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that I have caused a true and correct copy of the foregoing to be served upon the

individuals identified below via CM/ECF filing:

Clay Smith
Deputy Attorney General

Dated this 22nd day of July, 2010.


_____/s/_____
James M. Piotrowski